JUDGE COTE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISIANA SHERIFFS' PENSION & RELIEF FUND, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION, VIRGINIA M. ROMETTY, and MARK LOUGHRIDGE<br><br>Defendants. | Civ. A. No. 13 CV 8818<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>**ECF CASE** |

RECEIVED DEC 12 2013 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff Louisiana Sheriffs' Pension & Relief Fund ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by International Business Machines Corporation ("IBM" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning IBM; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This is a federal securities class action brought on behalf of purchasers of IBM's publicly traded common stock between June 25, 2013 and October 16, 2013, inclusive (the "Class Period").   The claims asserted herein are alleged against IBM and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     IBM is one of the largest information technology companies in the world, generating over $100 billion of annual revenue in 2011 and 2012.  The Company provides integrated business solutions that seek to reduce a client's operational costs or by enabling new capabilities that generate revenue.  One of IBM's most important business segments is its hardware division, known as Systems and Technology ("STG"), which accounts for approximately 20% of the Company's revenues, and which supplies systems for IBM's cloud computing offerings, one of IBM's most important growth initiatives.

3.     STG is of particular importance to the Company's business in China, a critical growth market for IBM.  Indeed, the Company consistently reported double-digit growth rates in the Country over the past several years and STG sales account for approximately 40% of IBM's revenues in China.  But in an effort to protect its intellectual property rights, IBM lobbied vigorously to enact a bill that would allow the Company to share its customers' personal data—including data regarding the Company's customers in China—with the U.S. National Security Agency ("NSA").  And in June 2013, *The Guardian* reported that it received top-secret documents showing that the NSA was part of a previously undisclosed program called Prism, which allowed the NSA to spy on China and other countries through major information technology and internet companies, such as IBM.

4.     IBM's association with the NSA presented a material risk to the Company's sales and, in particular, STG sales in China that were of critical importance to investors.  Upon the revelation of Prism (and related disclosures made by Edward Snowden), IBM knew that the government of China would not tolerate the Company's cooperation with the NSA, and would prohibit businesses and government agencies in China from purchasing IBM products.  Upon the disclosure of Prism, Defendants knew that IBM would face a steep decline in STG sales in China

as a result of such retaliation.  Despite that knowledge, during the Class Period, IBM misrepresented to investors that it was a market leader in the Asia-Pacific region and that IBM expected solid improvement in the sales of its hardware division from the second quarter of 2013 to the third quarter of 2013—the quarter immediately following the disclosure of Prism and related disclosures by Snowden.  The Company also actively concealed the immediate impact the revelation of Prism had on IBM's business in China.

5.      In truth, throughout the Class Period, the Company knew but misrepresented or concealed from investors that the disclosures of its lobbying and its association with the Prism and NSA spying scandal caused businesses in China as well as the Chinese government to abruptly halt doing business with IBM, leading to an immediate, and precipitous decline in sales. During that quarter, STG sales in China plummeted, a drastic departure from the double-digit growth that the Company had consistently reported.  And while the Company represented that security and privacy breaches could potentially impact IBM's business, including the loss of important customers, the Company concealed that those potentialities had already occurred during the Class Period with drastic consequences for the Company's business.  As a result of Defendants' false statements and omissions and fraudulent course of conduct, IBM common stock traded at artificially inflated prices during the Class Period.

6.      It was not until October 16, 2013, when IBM announced results for its third quarter of 2013, that investors learned the truth.  That day, the Company reported that its sales in China plunged 22% during the quarter, and hardware sales in China, which accounts for nearly half of IBM's revenue there, declined 40%.  These declines are all the more striking given that IBM sales in China increased 19% last year, driven heavily by strong performance in hardware sales.

7.     Immediately after the Company reported earnings, media outlets concluded that the only credible explanation for the sudden collapse in IBM's sales in China is that the Chinese government refused to allow government agencies, state-owned enterprises, and major independent corporations to conduct business with the Company.  As a result, the Company reassigned its head of emerging markets to a yet-to-be-determined post.  These disclosures caused the price of IBM stock to decline from $186.73 per share to $174.83 per share, or 6.4%, on heavy trading volume of over 22 million shares, damaging Plaintiff and the Class.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  IBM maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff Louisiana Sheriffs' Pension & Relief Fund is a multi-employer, defined benefit, governmental retirement plan providing retirement, disability and death benefits to more than 20,000 active and retired employees of the sheriff's offices in all 64 Louisiana parishes.  As

of September 30, 2013, Louisiana Sheriffs' had net assets in excess of $2 billion.  Plaintiff purchased shares of IBM stock on the New York Stock Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

11.     Defendant IBM, a New York corporation based in Armonk, New York, was founded in 1911 as the Computing-Tabulating-Recording Co.  The Company is now one of the largest information technology companies, worldwide.  IBM maintains its principal executive offices at 1 New Orchard Road, Armonk, New York 10504-1722.  The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "IBM."  IBM currently has approximately 1.1 billion shares of stock outstanding.

12.     Defendant Virginia M. Rometty ("Rometty") is, and was at all relevant times, chairman, president and chief executive officer of IBM and chair of IBM's Executive Committee.

13.     Defendant Mark Loughridge ("Loughridge") is, and was at all relevant times, IBM's Senior Vice President and Chief Financial Officer.

14.     Defendants Rometty and Loughridge are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with IBM, possessed the power and authority to control the contents of IBM's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been

disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## BACKGROUND

15.     IBM is a U.S.-based multinational technology and consulting firm that manufactures and markets computer hardware and software, and offers infrastructure, hosting and consulting services in numerous areas.  The Company's major operations consist of five business segments: Global Technology Services and Global Business Services, which the company collectively calls Global Services, and Software, Systems and Technology ("STG") and Global Financing.

16.     STG is IBM's hardware division and includes integrated systems known as System z, Power Systems and System x.  These systems form the foundation for IBM's integrated offerings, and are typically the core technology in data centers that provide required infrastructure for business and institutions.  STG also includes data storage products that allow clients to retain and manage volumes of digital information, and supplies systems for IBM's cloud computing offerings, such as IBM SmartCloud Entry and IBM BladeCenter for Cloud. Cloud computing is an expression used to describe a variety of different types of computing concepts that involve a large number of computers connected through a real-time communication network such as the internet.

17.     STG has been one of the Company's most important divisions, contributing almost $19 billion in revenue in 2011, and almost $18 billion in 2012.  STG is especially important for the Company's sales in China, which is one of IBM's most important growth markets.  Since IBM first started operating in China, the Company has established at least 50 branch offices in the Country.  Indeed, research firm IDC stated that the IT services market in

China would nearly double from $12.2 billion in 2012 to $23.7 billion in 2015. IBM was dependent upon China's spiking growth rates given the Company's expansion in China and the decline in other areas of its business. Indeed, IBM sales in China increased almost 20% in 2012, due in large part to strong performance in hardware sales.

18.     Despite knowing that the growth of STG, and the Company as a whole, was dependent upon expansion in China, the Company was one of the most ardent supporters of a controversial bill known as the Cyber Intelligence Sharing and Protection Act ("CISPA"), which was intended to make it easier for industry and the U.S. government to share information with each other. CISPA has sparked severe public backlash because of concerns that the bill does not protect the information of technology consumers. Indeed, one of privacy advocates' chief concerns is that the bill would allow technology companies to share detailed information regarding their customers directly with the NSA, without being required to remove information such as email addresses, IP addresses, names, and other identifying information.

19.     According to IBM's Vice President of Government affairs, IBM was intent on working closely with the NSA and sharing users' information in order to protect the Company's valuable intellectual property interests. In order to ensure CISPA's passage, IBM flew nearly 200 senior executives to Washington D.C. to lobby lawmakers and held 300 meetings with lawmakers and their staff over the course of two days.

20.     Then, on June 6, 2013, *The Guardian* released top-secret documents detailing the NSA's secret surveillance program known as Prism, in what was one of the most significant security lapses in NSA's history. Like CISPA, Prism rested on a collaboration between the NSA and major U.S. technology companies, such as IBM, to collect a variety of information on users' internet activity, such a searches conduced, email and chat content as well as file transfers. The

whistleblower who revealed the existence and scope of Prism was later revealed to be Edward Snowden, a former employee of the Central Intelligence Agency and a then-current employee of defense contractor Booz Allen Hamilton. Snowden also claimed that the NSA hacked into critical network infrastructure at universities in China and Hong Kong. According to former CIA and NSA director Michael Hayden, a retired four-star Air Force General, Snowden's leak was "the single most destructive leak of American security information in our history."

21.     The disclosures that the U.S. government was working with U.S. technology corporations to spy on China and other countries were particularly significant for multinational U.S. firms operating in China that feared a risk of reprisal. Just months earlier, the U.S. government took action against Chinese companies Huawei Technologies Inc. and ZTE Inc. because, according to the U.S. House Intelligence Committee, their equipment could be used for spying on Americans. In light of that security risk, the U.S. House Intelligence Committee recommended that the U.S. government avoid using equipment from the firms, and that U.S. companies seek alternative vendors for telecommunications equipment.

22.     Given the continued public backlash surrounding CISPA, the revelation of Prism, as well as the U.S. government's treatment of Chinese telecommunications companies, IBM was well-aware that its association with the U.S. spy program and its sharing of customers' information with the U.S. government would have immediate and adverse consequences on its business in China. Indeed, on June 24, 2013, *Reuters* reported that China's foreign ministry expressed "grave concern" over Snowden's allegations that the United States had hacked into computers in China and that it was using corporations as U.S. government proxies in its surveillance program.

23.     The Class Period starts on June 25, 2013, the day that IBM issued a press release touting its recognized status as a "clear" market leader in business intelligence and analytics across the Asia-Pacific region.  According to the press release, "IBM took the top spot for the quality of its capabilities and attributes, with the report citing a significant gap between IBM and the rest of the market, which included Accenture, Infosys, HP, Deloitte, and TCS."  IBM concealed from investors that its business in China was encountering serious problems.

24.     The statements and omissions set forth in ¶23 were materially false and misleading.  IBM knew or recklessly disregarded that the disclosures about Prism and IBM's association with the NSA's spying on foreign governments would cause the government in China to immediately stop doing business with the Company, and that the Chinese government would force businesses in China to stop contracting with IBM because of the Company's association with CISPA and Prism.  As a result, IBM knew or recklessly disregarded that its status as a market leader in the Asia-Pacific region, and its critical hardware sales in China on which that status was founded, were in serious jeopardy.

25.     On July 17, 2013, IBM reported its second quarter results for 2013.  On the earnings conference call, CFO Loughridge falsely stated that given the Company's growth markets performance, the Company was on "good footing as we enter the second half."  CFO Loughridge also falsely stated that STG was profitable in the second quarter and the Company expected the division to remain profitable for the full year.  And while CFO Loughridge stated that IBM's hardware business impacted the Company in the second quarter, IBM expected solid improvement in that division in the second half, and that the Company had "some very distinct tail winds that we have [] to drive our performance."  Further, defendant Loughridge stated that the Company expects "sequential improvement in [Power Systems] will continue in the second

9

half, as adoption of our new Power7 Plus products continues." Again, IBM continued to conceal from investors that its business in China was in the midst of a precipitous decline.

26.      The statements and omissions set forth in ¶25 were materially false and misleading. Given the Chinese government's reprisals against IBM arising from the Company's association with the Prism scandal, IBM was experiencing a steep decline in sales and knew that it was not well-positioned for the second half. IBM also knew that the performance of STG, the Company's hardware division, would decline precipitously instead of improving for the same reasons.

27.      On July 26, 2013, IBM filed a Form S-3 Registration Statement with the SEC that incorporated by reference the Company's Annual Report on Form 10-K for the year ended December 31, 2012. In the 10-K, IBM stated that "Cybersecurity and Privacy Considerations could impact the Company's Business," and that "Breaches of security could expose the company . . . to risks of loss . . . as well as the loss of existing or potential customers and damage to the company's brand and reputation." The Company omitted that such risks had already materialized.

> *Cybersecurity and Privacy Considerations could impact the Company's Business:* The company's products, services, and systems may affect critical third party operations or involve the storage, processing and transmission of proprietary information and sensitive or confidential data, including personal information of employees, customers and others. Breaches of security could expose the company, its customers or others to risks of loss, including the misuse of information or systems, resulting in litigation and potential liability for the company, as well as the loss of existing or potential customers and damage to the company's brand and reputation. In addition, the cost and operational consequences of implementing further data protection measures could be significant. Also, the company could be

negatively impacted by existing and proposed laws and regulations related to privacy and data protection.[1]

28.     The statements and omissions set forth in ¶27 were materially false and misleading.  While IBM represented that breaches of privacy or security could impact the Company's business, IBM concealed that those risks had already materialized in light of its association with the Prism scandal, its vigorous lobbying for CISPA, as well as the U.S. government's treatment of Huawei Technologies Inc. and ZTE Inc.

29.     Heightening investors' concerns, on August 16, 2013, *Reuters* reported that China's Ministry of Public Security and a cabinet-level research center were preparing to investigate IBM and several other global technology companies due to the Snowden revelations and Prism scandal.  According to *Reuters*, an anonymous source told the *Shanghai Securities News* that "[a]t present, thanks to their technological superiority, many of our core information technology systems are basically dominated by foreign hardware and software firms, but the Prism scandal implies security problems."

30.     A senior analyst with the Information Technology & Innovation Foundation told *Reuters* that he was concerned that a Chinese government probe could result in demands for U.S. companies to provide authorities with the blueprints to their technology so that Beijing could screen them for potential security threats, causing business to decline.  Further, according to a managing director of Marbridge Consulting, a Beijing-based market intelligence firm, "[t]he Prism scandal certainly provides ample material for a real concern. . . . What the scandal has done is make it increasingly difficult to ascertain what is being done out of a legitimate concern and what may be being done for any sort of political reasons."  IBM continued to conceal that its

---

[1] IBM incorporated by reference the same misstatements in its draft or final prospectus supplements filed with the SEC on July 29, 2013, and July 31, 2013.

business was being impacted by Snowden's whistleblower allegations, its involvement in CISPA, and the Chinese government's attendant response.

31.     Then, on October 16, 2013, after the close of trading, IBM announced results for its third quarter of 2013.  The Company reported revenue of $23.7 billion for the third quarter, down 4% year-over-year, due in large part to disappointing STG revenues, which were down 17% from what IBM earned over the same period in 2012.  According to defendant Loughridge, "[t]wo-thirds of the overall hardware decline was driven by the growth markets," including China, and nearly every aspect of the hardware business in China "was down substantially." IBM also reported that revenue in its Asia-Pacific region plummeted 15% year-over-year, and that its revenue in China—which accounts for 5% of IBM's total revenues, dropped 22%. Further, hardware sales in China, which account for nearly half of the Company's business there, declined 40%.  As noted, these declines were particularly surprising because investors tended to see double-digit growth rates in China, driven by the Company's hardware division.

32.     CFO Loughridge falsely attempted to attribute the decline to China's "development of a broad based economic reform plan" which caused "demand from state-owned enterprises and the public sector [to] slow significantly as decision-making and procurement cycles lengthened."

33.     But immediately after the Company reported earnings, media outlets began to question IBM's reasons for its disappointing results in China.  According to a October 17, 2013 article published on *Business Insider.com*, the only credible explanation for the sudden collapse in IBM's sales in China is that the Chinese government refused to allow government agencies, state-owned enterprises and major independent corporations to conduct business with the Company.  According to the article, no one believed the "rigmarole" about China's reform plan

impacting IBM's earnings, and that the Company "didn't even have time to come up with a credible excuse." Defendant Loughridge "was struggling to make sense of it, grasping at flimsy straws and the same economic reform plan theory that no [one] had believed earlier, but this time, it got all tangled up." Indeed, *Business Insider* reported that the "more obvious" explanation is that IBM had become a target of the government in China due to the Snowden revelations.

34.    Similarly, *CNBC.com* published an article stating that China was refusing to do business with IBM and other large U.S. tech and hardware firms. According to an executive at another "top-tier tech firm" cited in the article, "China might be targeting big U.S. tech and hardware firms that have an outsized presence [in China] for something of a squeeze. The rumor is . . . that the Chinese power structure wants to direct more [of] that business to domestic firms." Further, another article published on *Collapse.com* stated that the cause for the Company's disappointing results was that the Chinese government was "rethinking" its relationship with IBM.

35.    As a result of IBM's issues, the Company reassigned its head of emerging markets, James Bramante, to an undetermined position. These disclosures caused the price of IBM stock to decline from $186.73 per share to $174.83 per share, or 6.4%, on heavy trading volume of over 22 million shares.

36.    In sum, the true facts, which Defendants knew but misrepresented or concealed from investors, were that IBM knew that disclosures of the Prism scandal and IBM's involvement in CISPA caused the Chinese government to abruptly halt its business with the Company, and that the Country forced businesses in China to stop contracting with IBM, leading to an immediate and precipitous decline in sales. As a result, the security and privacy breaches

13

that IBM couched as potential risks had already materialized with drastic consequences for the Company's business.

## LOSS CAUSATION

37.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of IBM common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on October 16, 2013, the price of IBM common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of IBM common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of IBM during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of IBM and their families and affiliates.

39.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  IBM has approximately 1.1 billion shares of common stock outstanding, owned by hundreds or thousands of investors.

40.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants omitted and/or misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)    Whether the price of IBM common stock was artificially inflated;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

41.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

42.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

43.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

44.    IBM's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

45.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of IBM who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

46.     At all relevant times, the market for IBM's common stock was an efficient market for the following reasons, among others:

(a)     IBM stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)     As a regulated issuer, IBM filed periodic public reports with the SEC and the New York Stock Exchange;

(c)     IBM regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    IBM was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

47.    As a result of the foregoing, the market for IBM securities promptly digested current information regarding IBM from all publicly available sources and reflected such information in the price of IBM stock.  Under these circumstances, all purchasers of IBM common stock during the Class Period suffered similar injury through their purchase of IBM common stock at artificially inflated prices and the presumption of reliance applies.

48.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding IBM's business operations in China—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of IBM's business in China, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

49.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase IBM common stock at artificially inflated prices.

51.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for IBM common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

52.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

53.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

54.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal IBM's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

55.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for IBM common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for IBM common stock had been artificially inflated by Defendants' fraudulent course of conduct.

56.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

57.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

58.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

59.     The Individual Defendants acted as controlling persons of IBM within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about IBM, the Individual Defendants had the power and ability to control the actions of IBM and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: December 12, 2013

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP

Gerald H. Silk
Avi Josefson
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554 1400
Facsimile:  (212) 554 1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Proposed Lead Plaintiff,
Louisiana Sheriffs' Pension & Relief Fund and
Proposed Lead Counsel for the Class*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Osey McGee, on behalf of Louisiana Sheriffs' Pension & Relief Fund ("LSPRF") hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of LSPRF. I have reviewed the complaint with the Fund's legal counsel, and based on the legal counsel's knowledge and advice, authorize its filing.

2. LSPRF did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. LSPRF is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. LSPRF's transactions in the International Business Machines Corp. securities that are the subject of this action are set forth in the chart attached hereto.

5. LSPRF has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re Lululemon Securities Litigation*, Case No. 13-cv-04596 (S.D.N.Y.)

6. LSPRF will not accept any payment for serving as a representative party on behalf of the Class beyond LSPRF's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.


The Louisiana Sheriffs' Pension & Relief has relied on the research and analysis of the complaint provided by legal counsel Berstein Litowitz Berger & Grossman LLP. The undersigned declares that the statements made and information provided are, to the best of his knowledge, true and correct. Executed this 5th day of December, 2013.

_____
Osey McGee
Executive Director
*Louisiana Sheriff's Pension & Relief Fund*

**Louisiana Sheriff's Pension & Relief Fund**
Transactions in International Business Machines Corp. (IBM)

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 9/12/2013 | 2,400 | $190.5421 |
| Purchase | 9/12/2013 | 300 | $190.9452 |
| Purchase | 9/16/2013 | 2,400 | $194.0576 |
| | | | |
| Sale | 6/12/2013 | (700) | $201.3421 |
| Sale | 6/13/2013 | (600) | $201.3768 |
| Sale | 6/14/2013 | (559) | $202.3037 |
| Sale | 6/20/2013 | (500) | $197.9703 |
| Sale | 6/21/2013 | (500) | $195.4606 |
| Sale | 6/27/2013 | (1,900) | $196.3343 |
| Sale | 7/10/2013 | (1,100) | $192.5280 |
| Sale | 7/11/2013 | (1,300) | $193.3101 |
| Sale | 7/17/2013 | (600) | $193.6458 |
| Sale | 7/19/2013 | (700) | $194.4679 |
| Sale | 7/19/2013 | (500) | $194.4395 |
| Sale | 7/22/2013 | (1,241) | $195.1144 |
| Sale | 8/15/2013 | (3,950) | $186.1056 |
| Sale | 8/15/2013 | (2,100) | $185.8848 |